## CLARK *et al.* v. CLINE *et al.*

1. Where a county contains a town or city having a school system sustained by local taxation for a period of five months or more, to which direct apportionments are authorized to be made, the part of the entire county fund to be so paid is determined by the proportion which the school population of the town or city bears to the school population of the county as shown by the last school census.   The statute declares that the division is to be made according to school population, not according to the number actually attending the schools.

2. The school population includes all children between the ages of six and eighteen years.

3. Children of school age resident in the county attending the public schools of such town or city are to be counted in the school population of such town or city, and are entitled to have their share of such county fund paid over to the proper officer of the municipal school board.

4. The local system of the City of West Point (created by the act of 1877) falls within this rule.

5. The question raised as to the constitutionality of the act of 1904, providing for the payment of the whole school fund of the county to the county commissioner of Troup county and a payment by him to the local school system of West Point of its share, was not decided by the presiding judge, and will not be determined by this court.

6. If the county school fund of Troup county, in which West Point is located, has been customarily paid to the county school commissioner, and a division made and the share of the city system of schools paid by him to it, and if the amount so paid is larger than the city system is entitled to under the law, and the county board of education and county school commissioner intend to continue such payment, citizens and taxpayers of the county outside of the city, who are also patrons of a school outside the city, have such an interest as will authorize them to proceed by application for injunction to prevent such payments.

7. The county board of education constitutes a tribunal for hearing and determining any matters of local controversy in reference to the construction or administration of the school law.   But this does not oust a court of equity of its power to enjoin the board of education and school commissioner from making unlawful payments of part of the county school fund to a municipal school system operating independently of the county system.

Submitted July 1, — Decided August 5, 1905.

Injunction.    Before Judge Freeman.    Troup superior court.
May 18, 1905.

Cline and others filed their equitable petition alleging that the county school commissioner of Troup county had received the county school fund; that it was in the hands or under the control of the county board of education; and that the commissioner and the board of education were about to pay over to the officials of an independent local system in the City of West Point an amount in excess of that which was allowed by law, and would do so unless enjoined. By an amendment the board of education of West Point was made a party. It was alleged that the amount to be paid the local school system should be determined according to the school population, and not according to school attendance; but that the payment which it was proposed to make would be according to attendance. The defendants answered, and contended that the payment which would be made would be according to law, and that the contention of the plaintiffs would work an unjust and unequal mode of distribution. They also demurred to the petition. On the hearing the presiding judge granted the injunction, and the defendants excepted.

*Longley & Longley* and *Hatton Lovejoy*, for plaintiffs in error.
*H. A. Hall* and *D. J. Gaffney*, contra.

LUMPKIN, J. (After stating the facts.) 1–5. On February 7, 1877 (Acts 1877, p. 192), an act of the legislature was passed, the caption of which was, "An act to authorize the City of West Point, in Troup county, to organize a public school system independent of the public school system of the State of Georgia, and for other purposes." The first section provides, "That the City of West Point, in the county of Troup, be, and is hereby, authorized to organize a public school system independent of the public school system of this State; that said organization shall draw its pro rata share of all educational funds raised by this State, and that the chief executive officer of such organization shall make the same regular reports to the State school commissioner as are required from the county school commissioner of the public school system of this State." Under this act an independent public school system was created for the City of West Point; its chief executive officer was required to make reports to the State school commissioner, similar to those required from county school commissioners; and this independent organization was to draw its pro rata share of all educational funds raised

by the State. The act itself did not declare how the pro rata share was to be ascertained; but that was left for determination according to the general law. The legislature had power to declare how the pro rata share of independent school systems should be determined, and on what basis calculated, and the West Point system under this act was entitled to its pro rata share calculated on the basis which the legislature might fix at any time.

In 1887 an act was passed revising, amending, and consolidating the school laws of the State. Acts 1887, p. 68. In 1894 an act was passed to systematize the finances and increase the efficiency of the common schools. Acts 1894, p. 60. The laws relating to the public school system will be found codified in the Political Code of 1895, §§ 1338-1408. Several amendments to the school laws have been made since that code, but none of them are material to this controversy, and none are relied on by counsel, except a local act passed in 1904, which will be referred to hereafter. Section 1406 of the Political Code, which was codified from the act of 1894, reads as follows: "In those counties having local laws, where schools are sustained by local taxation for a period of five months or more, the State school commissioner shall, on the first day of January, April, July, and October of each year, or as soon thereafter as practicable, notify the Governor of the amount of funds standing to the credit of each of such counties on the books of the treasurer on said dates, arising from the quarterly apportionments aforesaid, and thereupon the Governor shall issue his warrant for said sums, and the treasurer shall draw his checks for said sums without requiring the itemized statements as provided; and the State school commissioner shall immediately transmit said checks to the officer under the local system authorized to receive its funds, and the State school commissioner shall, in like manner, pay over to the proper officer under the school board of any town or city having a school system sustained by local taxation for a period of five months or more, and to which he is now authorized by law to make direct apportionments, such proportion of the entire county fund as shown on the books of the treasurer as the school population of the town or city bears to the population of the county, as shown by the last school census: *provided,* that all children of school age resident in said county, and attending the public schools of

such town or city, shall be counted in the school population of such town or city and be entitled to have their share of such county fund paid over to the proper officer of the school board of such town or city." This distinctly declares that the State school commissioner shall pay over to the proper officer under the school board, in a town or city having a separate school system, "such proportion of the entire county fund as shown on the books of the treasurer as the school population of the town or city bears to the population of the county." (Omitting the proviso as to children resident in the county and attending the public schools in the town or city.) This language is plain and clear. It declares how the proportion or pro rata part of the entire county fund which shall be paid to the proper officer of the local school board is to be determined. The rule laid down for making the calculation is this: As the school population of the town or city is to the school population of the county, so is the proportion or share of the county fund which shall be paid to the officer of the local board to the entire county fund. Thus, if the entire school population of the county were five thousand, and the school population of the town or city were one thousand, the local system would be entitled to one fifth of the entire county fund. In estimating the school population of the town or city the proviso at the end of this section declares that all children of school age resident in the county, and attending the public schools of such town or city, shall be counted in the school population of such town or city, and be entitled to have their share of the school fund paid over to the proper officer of such town or city. In the illustration given the one thousand, therefore, is to be considered as including the school population as thus calculated in accordance with the terms of the act.

It is contended that the act of 1894 and the section of the code derived from it do not apply to the school system of West Point, because the act authorizes the State school commissioner to pay over to the proper officer "under the school board of any town or city having a school system sustained by local taxation for a period of five months or more, and to which he is now authorized by law to make direct apportionments." It is not denied that West Point is a city having a school system sustained by taxation for a period of five months or more; but it is contended that the

act by its terms is applicable only where the State school commissioner "is now authorized by law to make direct apportionments;" and that the West Point school system does not fall within this description. As has already been noted, under the act of 1877 the City of West Point was authorized to organize an independent public school system, having a chief executive officer who was required to make to the State school commissioner reports similar to those required by county school commissioners, and "said organization shall draw its pro rata share of all educational funds raised by this State." In the second section of the act, after providing for the election of a board of commissioners for the school system, it is expressly declared that "Said board shall receive all monies drawn from the educational funds raised by this State, and all funds raised by taxation in said city," etc. There is nothing in the act which intimates that the county school commissioner of Troup county is to receive the pro rata share of the educational fund from the State, and pay it over to the local board. While it did not in terms declare that the State school commissioner should make a direct apportionment to the local board, yet it seems to us the very plain meaning of the act is to authorize him to do so. What reason was there for requiring the chief executive officer to make regular reports to the State school commissioner similar to those made by county school commissioners, and declaring that the board should receive all monies drawn from the educational funds raised by the State, if the legislature meant that the county school commissioner should receive these funds and pay them over to the board? This act nowhere even mentions the county school commissioner, but places the local board in direct communication with the State school commissioner. It is said in the brief of counsel that it has been the practice under that act for the county school commissioner to receive the funds from the State school commissioner, and pay over to the local board its proportion. We do not know how this may be, but we entertain no doubt that under the act of 1877 the State school commissioner was authorized to make a direct apportionment to the local board, and that it therefore came within the terms of the act of 1894. Even if this were not clear, there has been a practical adjudication on this point, in the case of *Bridges* v. *State,* 103 *Ga.* 21, 35. In the opinion Chief Justice

Simmons said: "By an act approved August 11, 1881 (Acts 1881, p. 421), a public school system was established for the City of Rome, independent of the county school system. Under its provisions, that portion of the school fund which belonged to the City of Rome was paid by the State authorities to the county school commissioner, who was in turn required and authorized to pay it to the city authorities. The general act approved October 27, 1887 (Acts 1887, p. 68), contains no provisions which would authorize the payment by the State authorities directly to the City of Rome of her proportion of the school fund, but the act approved December 13, 1894, codified as section 1402 et seq. of the Political Code, does provide expressly for such payment. As to this matter, the terms of the act (Pol. Code, § 1406) apply to the schools of the County of Floyd and the City of Rome, and the school funds belonging to the latter pass directly into the hands of the proper city authorities." Indeed, it was held in that case that the county school commissioner was not authorized in his official capacity to receive or disburse that portion of the school fund.

It is contended that if the State school commissioner was authorized at any time to pay the pro rata share of the West Point school system directly to the local board, this was changed by the act of August 13, 1904. Acts 1904, p. 332. This act amended the act of 1877 by adding at the end of the first section the following words: "Said officer shall file a copy of said reports with the county school commissioner of Troup county, and said public school system of West Point shall draw its pro rata share of the public school money apportioned each year to said county, and the county school commissioner shall pay the same over to the person authorized to receive it." Plaintiffs reply by saying that this act is unconstitutional as being a special law in a case provided for by the general laws above referred to. The presiding judge did not decide this constitutional question, and therefore we deem it unnecessary to do so. Whether that act is constitutional or not makes no difference as to the mode of calculating the pro rata share of the local school system of West Point. It merely affects the question whether such share shall be paid directly to the local board, or whether it shall be paid to the county school commissioner, and by him to the local board. If,

then, the rule is that the pro rata share of the local system is to be determined according to the ratio between the school population of the city and the school population of the county, the only remaining question, in ascertaining the exact amount, is to determine what constitutes the school population. This is answered by sections 1389, 1390, and 1391 of the Political Code, which provide for taking a census of the school population, and declare that there shall be an enumeration of the number of children between the ages of six and eighteen years. With these rules stated, there can be no difficulty in determining what is the pro rata share of the entire county school fund which shall be paid to the local board of West Point. It is urged that the fund going to the county outside of West Point — or at least in the school which is patronized by the complainants — is disbursed according to school attendance, and that it is unfair and inequitable to make this disbursement on such a basis, while in the City of West Point the attendance is much higher, so that the amount per scholar according to attendance in West Point is much less than the amount per scholar according to attendance outside of West Point. Whether the argument is based on sound considerations of equity or not is immaterial; and on that point we express no opinion. The statute determines the mode by which the pro rata share to be paid to the local school board shall be ascertained. If it is not a just rule, the legislature can change the law; the courts can not do so. The pro rata shares of the counties are determined on the same basis of school population. Pol. Code, § 1403. After the share of the local school system has been paid over to its board, the balance remains for use by the county authorities. The county board has power to employ teachers and make contracts with them. Id. § 1360. "It shall be the duty of said board to make arrangements for the instruction of the children of the white and colored races in separate schools." Id. § 1363. "The county board of education shall have power, if they deem best, to employ teachers at a salary." Id. § 1370. It will thus be seen that considerable discretion is conferred upon the county board of education in reference to the disbursement of the county fund and the payment of teachers. There is nothing in the law which requires them to pay the teachers according to the number of scholars attending. Indeed, if the public school system of

West Point has received all that it is entitled to, we do not perceive how it is concerned with the mode in which the county board of education shall disburse that part of the fund over which they have control. Whether the number of children attending the school is made the basis for paying the teacher, or whether the teacher is employed at a salary, or like matters, do not affect the local school system. There is no claim that the county board of education is making any unlawful use of the remaining fund.

On August 26, 1903, the Hon. John C. Hart, attorney-general, furnished to the State school commissioner an opinion in which he construed the law in regard to determining the pro rata share of local systems. See Opinions of Attorneys-general from January 1, 1891, to January 1, 1904, p. 387. In it he says: "The county is treated as a unit, and the local system should be treated as but another unit in a unit. . . . I therefore advise, irrespective of any directions to the contrary in the act creating the local systems, that you adopt the rule of apportionment between the local system and the county, using as a basis 'the proportion which the school population of the local system bears to the school population in the county.'" In this case it appears that there are local systems in Hogansville and LaGrange, and, in making his calculation as to the amount which shall be paid by the county school commissioner to the local system at West Point, the presiding judge excluded the school population in those two places. The acts creating those local systems are not before us, nor is any contention made in regard to them. We are led to infer that they receive their pro rata share directly and not through the county school commissioner, and therefore, that, inasmuch as the county school commissioner has been receiving the share of the West Point system along with that of the rest of the county, the calculation is made accordingly. No contention is made before this court that the exclusion of the school population of Hogansville and LaGrange in making the calculation is improper. The judge in granting the injunction also states that this judgment does not prohibit said county school commissioner from paying the West Point schools, in addition to such proportion, such sum as is provided by law for children outside of the city, attending the schools of West Point.

6. 7. It is urged, that, even if the method of division which is

attacked by this proceeding is illegal, nevertheless the plaintiffs are not entitled to injunction, both because they are not injured, and because the county school board constitutes a school court, and that it, and not the superior court, has jurisdiction of the subject-matter of this controversy. One who neither is nor will be hurt by an illegal proceeding has no right to enjoin it. Thus in *Mayor* v. *Simmons*, 96 *Ga.* 477, complaint was made by citizens and taxpayers of Gainesville that the county school commissioner of Hall county was making payments to be used in the support and maintenance of the public schools of that city, which were illegal. It was held that the complainants were not entitled to an injunction, because "no person can possibly be heard to complain in equity of that with which he is in no way concerned, and which not only can not injure him but may operate to his benefit." See also *Reid* v. *Eatonton*, 80 *Ga.* 755. The facts of this case, however, do not bring it within the decisions cited. The plaintiffs are citizens and taxpayers of the county outside of the City of West Point, and patrons of the rural schools. They therefore have a direct interest in having the school fund applicable to the county system properly preserved and lawfully applied, and to enjoin its misuse or disposition contrary to law. A taxpayer, though his contribution to the public fund may be small in proportion to the aggregate, nevertheless has such a pecuniary interest in the sum made up from taxes, of which his forms a part, as to authorize him to see that there is no illegal diversion of such sum. Such a fund is in the nature of a trust fund, which equity will preserve from misapplication. Accordingly it has been held that citizens and taxpayers of a town could enjoin the unlawful establishment of a dispensary by the corporate authorities, because it would or might require an improper expenditure of the public funds. *Mayor etc. of Leesburg* v. *Putnam*, 103 *Ga.* 110. In *Mayor etc. of Macon* v. *Hughes*, 110 *Ga.* 795, it was held proper to enjoin municipal authorities from holding an election to determine whether a given territory should be annexed to a city, when the ordinance calling the election was plainly ultra vires. This was done at the instance of residents and taxpayers. In *Mitchell* v. *Lasseter*, 114 *Ga.* 275, 281, it was said: "A court of equity will, at the instance of citizens and taxpayers of a county, enjoin the authorities in charge of the affairs of such

county from carrying into effect an unauthorized order or judg-ment providing for the location of a county-site, in the execution of which order it will be necessary either to expend the money of the taxpayers in the treasury of the county, or to incur illegal indebtedness by the county." In *Mayor of Americus* v. *Perry*, 114 *Ga.* 871, 884–5, it was held proper, at the instance of tax-payers and citizens of a municipal corporation, to enjoin the authorities from carrying into effect various ordinances which were ultra vires, providing for the election of certain public officers, for the reason that if such officers were elected · they would have an apparent demand against the municipality for compensation, which would have to be resisted at the expense of the taxpayers, or illegally paid out of the funds of the corporation. See also 2 High on Injunctions (3d ed.), §§ 1236, 1241, 1243 ; Rice *v.* Smith, 9 Iowa, 570.

As to the contention that the board of education of Troup county is a school court, it may be said that for certain purposes and within certain limits this is true. But it is a court of lim-ited jurisdiction. *Cheney* v. *Newton*, 67 *Ga.* 477. It is a tribu-nal for hearing and determining any matters of local controversy in reference to the construction and administration of the school law. Pol. Code, 1895, § 1364. Thus the board has power as to the establishment and location of schools, the employment of teachers, and, until recently, in the selection of text-books; also in the preservation of order, enforcement of discipline, and the carrying out of the rules that may be established. Controversies occurring out of these and other similar matters are properly for the consideration of the county board of education. *Pierce* v. *Beck*, 61 *Ga.* 413. But they have no power to unlawfully give to a separate local school system money which does not properly be-long to it, nor to misapply public funds arising from taxation. Whether their jurisdiction to determine matters of local contro-versy in reference to the construction or administration of the school law would confer upon them authority to pass upon the constitutionality of an act of the legislature, or to render a judg-ment on that subject which would be binding as an adjudication, may well be doubted. Certainly they have no authority to grant an injunction to prevent the unlawful payment of money from be-ing made. In the opinion filed by the presiding judge it was

said : " It is admitted that by this system the sum of money paid over to the West Point schools, being based on attendance on said schools, is greater than these schools would receive if based on school population. . . It is admitted that more is paid to West Point schools than her proportion based on school population, and the board of education and county school commissioner propose to continue such payment." Under such circumstances, the remedy by injunction was proper. The remark made in the opinion in *Mayor of Gainesville* v. *Simmons*, supra, that "It is the business of the State school commissioner, and not of the taxpayers of Gainesville, to determine whether or not the school commissioner of Hall county makes illegal or unauthorized payments to the Gainesville school fund," was not an adjudication that taxpayers outside of Gainesville would not have had the right to invoke the aid of a court of equity to protect their interests. This statement is to be taken in connection with the fact above referred to, that the schools of Gainesville were already receiving more than they were entitled to ; and the taxpayers of that municipality were not in a situation to set themselves up as regulators to enjoin a distribution of which they were receiving the benefit.

*Judgment affirmed. All the Justices concur, except Simmons, C. J., absent.*