## A. J. ROCKNE v. FLOYD B. OLSON AND OTHERS.[1]

April 6, 1934.

No. 29,781.

[1]Reported in 254 N. W. 5.

*Harry H. Peterson,* Attorney General, and *Matthias N. Orfield* and *Roy C. Frank,* Assistant Attorneys General, for appellants.

*Briggs, Weyl & Briggs,* for respondent.

*STONE, Justice.*

Defendants appeal from an order granting a temporary injunction.

As a taxpayer, plaintiff sues for an injunction preventing the issue and sale of bonds hereinafter considered. The defendants, other than Messrs. Arens and Lamson, are sued as members of the state board of investment (hereinafter referred to as the board). Messrs. Arens and Lamson are joined, respectively, as conservator of rural credit and secretary of the board of investment. The Honorable Floyd B. Olson, the Honorable Harry H. Peterson, the Honorable Stafford King, and the Honorable Julius A. Schmahl are, respectively, the governor, attorney general, state auditor, and state treasurer. But none of them is sued in his capacity as a constitutional executive official of the state any more than the Honorable Fred B. Snyder is joined as president of the board of regents of the state university. Each of these gentlemen, under the statute creating the board of investment, 1 Mason Minn. St. 1927, § 6303 (see also Minn. Const. art. 8, §§ 5 and 6), just happens to be *ex officio* a member of the board, which consists of the governor, the attorney general, the state auditor, the state treasurer, and the president of the board of regents.

The establishment of the rural credit bureau (hereinafter referred to for convenience as the bureau) was authorized by the amendment of art. 9, § 10, of the constitution, adopted in 1922. It was created by L. 1923, c. 225 (1 Mason Minn. St. 1927, §§ 6030-6057). The liqui

dation of the bureau was required and provided for by L. 1933, c. 386, under which the authority of the bureau expired July 1, 1933. It was then succeeded, for purposes of liquidation, by the conservator, defendant Arens having been promptly appointed to that office.

From 1923 to 1926 the bureau had sold to the state board of investment its bonds ranging in denominations from $500,000 to $2,000,000 in the aggregate principal sum of $8,000,000. Those bonds were purchased and are held for account of the permanent trust funds of the state.

Just before June 24, 1933, the bureau authorized the issue of $8,000,000 of $4\frac{1}{4}$ per cent coupon bonds and tendered them to the board "in exchange" for the original bonds in the same principal sum just above referred to. The maturities of the proposed new bonds were other than those of the old and considerably postponed. June 24, 1933, the board passed a resolution reciting the proposed issue of the new bonds by the bureau and their tender "in exchange" for the original bonds. The resolution further recited that the new bonds "would be readily marketable [because of their small and conventional denominations] whereas the bonds now held are not and this board is in need of additional funds with which to make loans for which applications have been filed and are in prospect." The resolution concluded with a declaration that the new bonds should be exchanged for the old with proper adjustment for accrued interest "and that the secretary [Mr. Lamson] be authorized to effectuate such exchange as soon as such coupon bonds are ready for delivery."

Concurrently with the passage of that resolution the board adopted another accepting the offer of a named purchaser to pay par and accrued interest for the new bonds "which this board has agreed to take from the rural credit bureau in exchange" for the old bonds.

It was not proposed by either the bureau or the board that the new bonds should be sold upon or through competitive bidding as required by the statute soon to be considered. No bids were called for publicly. The proposed sale, if consummated, would have been private. By that no criticism is intended of anyone. There is and can be no suggestion that the defendants and all of them were not

proceeding in the utmost good faith. The new bonds were about to be thus delivered and sold when this action was commenced and further proceedings prevented, first, by a temporary restraining order and then by the injunction *pendente lite,* from the order granting which defendants appealed.

■ Defendants deny the jurisdiction of this court to restrain them by injunction. The law is against them there. Therein is no derogation of the independence of the governor, the attorney general, the auditor, and the treasurer of the state in their respective fields as constitutional executive officers of the state. Within the constitutional limits of their jurisdiction they have an independence of official action no less complete and no less important than that of the judiciary. But when litigation properly presents a question whether proposed administrative action of an executive or administrative official is within the law, constitutional or statutory, both the subject of inquiry and the duty of decision are at once and automatically removed from the field of executive to that of judicial action and duty. (Of course, if the question is political rather than legal, the courts will have nothing to do with it in any event.) No proposition is more thoroughly settled in the jurisprudence of both the United States and England. McConaughy v. Secretary of State, 106 Minn. 392, 119 N. W. 408; Cooke v. Iverson, 108 Minn. 388, 122 N. W. 251, 52 L.R.A.(N.S.) 415; Marbury v. Madison, 1 Cranch, 137, 2 L. ed. 60. No matter how exalted the office or how worthy the incumbent, he loses the protection of his office and its dignity; his acts become those of an ordinary individual rather than those of an officer of government; if and when he oversteps the limits of official power as declared by either constitutional or statutory law. Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. ed. 714, 13 L.R.A.(N.S.) 932, 14 Ann. Cas. 764. Even President Jefferson was admonished to that effect (and by a judge of his own selection and politics) in Ex parte Gilcrist, 5 Hughes, 1.

■ Denial of plaintiff's right as a taxpayer to institute and maintain an action for injunctional relief is equally untenable. Two things are plain: (1) Defendants propose to obligate the state in the sum of $8,000,000 by a *new* issue of bonds to a *new* creditor;

314

and (2) they propose to sell the bonds without competitive bidding, that is, at private sale. The former is enough to entitle any taxpayer to challenge the proposed transaction as plaintiff is doing in this case. Regan v. Babcock, 188 Minn. 192, 201, 247 N. W. 12. The right of a municipal taxpayer to challenge the issue of municipal bonds is unquestioned. 19 R. C. L. 1030. The right of a state taxpayer is identical as to state bonds.

■ On the merits, much argument has been properly addressed to the general and necessarily broad powers of the bureau of rural credits under the constitutional and statutory law of its being. That argument we pass because we find the case susceptible of decision upon another ground which makes further inquiry unnecessary. L. 1923, c. 225, § 12 (amended in a manner not now material by L. 1925, c. 244, § 4), 1 Mason Minn. St. 1927, § 6041, provides that "all bonds" issued by the rural credit bureau "shall be sold upon competitive bids after proper notice unless they are sold to the state's trust funds." Obviously the bonds presently involved are not being sold to the state trust fund. The intention was rather, first to exchange them for the old bonds, and then immediately to sell them, *not* to any state trust fund, but to a private party, without any public notice or competitive bids. That is so plainly a violation of the demand of the statute that the proposed sale was unauthorized, and so, for that reason, properly enjoined.

The statute is not directed to either bureau or board as such. It operates directly upon the sale by the state of rural credit bonds. It is a command to all officers authorized to sell those bonds for the state. The inhibition of private sale is therefore as operative against the board as against the bureau. The policy thus expressed is just as plainly controlling as that upon which decision was based in State ex rel. Board of Education v. Erickson, 190 Minn. 216, 251 N. W. 519.

Order affirmed.